## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| SCOTT HUMPHREY,<br><br>              Plaintiff,<br><br>     v.<br><br>HYUNDAI CAPITAL AMERICA, INC.<br>d/b/a KIA MOTORS FINANCE, EQUIFAX<br>INFORMATION SERVICES, LLC, AND<br>EXPERIAN INFORMATION SERVICES,<br>INC.,<br><br>              Defendants. | Case No.: 2:22-cv-4101<br><br><br>Jury Trial Demanded |

## COMPLAINT SEEKING DAMAGES FOR VIOLATIONS OF THE
## FAIR CREDIT REPORTING ACT

### I.      INTRODUCTION

1. Plaintiff Scott Humphrey ("Plaintiff"), by and through his undersigned Counsel, and brings this action to challenge the actions of defendants Hyundai Capital America, Inc., d/b/a Kia Motors Finance ("Kia"), Equifax Information Services, LLC ("Equifax"), and Experian Information Solutions, Inc. ("Experian") (jointly referred to as "Defendants") with regard to erroneous reports of derogatory credit and Lease information to national reporting agencies and Defendants' failure to properly investigate Plaintiff's disputes.

2. Defendants failed to properly investigate Plaintiff's disputes, damaging Plaintiff's creditworthiness.

3. Defendant Kia further improperly attempted to collect amounts not permitted by law, causing Plaintiff confusion, stress, and other damages.

4. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

5.  Unless otherwise stated, all the conduct engaged in by Defendants took place in Missouri.

6.  Defendants committed each of these violations knowingly, willfully, and intentionally, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

7.  Through this Complaint, Plaintiff does not allege that any state court judgment was entered against anyone in error, and Plaintiff does not seek to reverse or modify any judgment of any state court.

8.  The United States Congress has found the banking system is dependent upon fair and accurate credit reporting.

9.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

10. Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. ("FCRA"), to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

11. The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other information on consumers.

12. The FCRA also imposes duties on the sources that provide credit information to credit reporting agencies, called "furnishers."

13. The FCRA protects consumers through a tightly wound set of procedural protections from the material risk of harms that otherwise flow from inaccurate reporting.

14. Thus, through the FCRA, Congress struck a balance between the credit industry's desire to base credit decisions on accurate information, and consumers' substantive right to protection

from damage to reputation, shame, mortification, and the emotional distress that naturally follows from inaccurate reporting of a consumer's fidelity to his or her financial obligations.

## II.    JURISDICTION AND VENUE

15.    This Court has federal question jurisdiction because this case arises out of Defendants' violations of federal law—the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*

16.    Jurisdiction of this Court arises pursuant to 28 U.S.C. § 1331.

17.    Venue is proper pursuant to 28 U.S.C. § 1391 as all the events and omissions giving rise to Plaintiff's claims occurred in Missouri.

18.    Defendants are subject to the Court's personal jurisdiction, as Defendants conduct business within Missouri, and Defendants' conduct giving rise to this action accrued in Missouri.

19.    Plaintiff is informed and believes and thereon alleges that all acts of corporate employees as hereinafter alleged were authorized or ratified by an officer, director or managing agent of the corporate employers.

20.    Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein that each Defendant was the principal, agent or employee and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiff for the relief prayed for herein.

## III.    PARTIES

21.    Plaintiff, Scott Humphrey, is a citizen of the State of Missouri, residing in the Western District of Missouri, and a natural person.

22.    Plaintiff is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

23.    Defendant Kia is organized as a California corporation.

24.    Kia does business in the State of Missouri and maintains a registered agent and office in

the State of Missouri.

25. Kia's registered agent address is: National Registered Agents, Inc., 120 South Central Avenue, Clayton, MO 63105.

26. KIA is a furnisher of information, as contemplated by 15 U.S.C. § 1681s-2(b), that regularly and in the ordinary course of business furnish information to a consumer credit reporting agency.

27. Unless otherwise indicated, the use of KIA's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of KIA.

28. Defendant Equifax is an entity doing business in the State of Missouri.

29. Defendant Equifax's registered agent address is: CSC – Lawyers Incorporating Service Company, 221 Bolivar St., Jefferson City, MO 65101.

30. Defendant Equifax regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and use interstate commerce to prepare and/or furnish the reports.

31. Equifax is a "consumer reporting agency" as that term is defined by 15 U.S.C. §1681a(f).

32. Unless otherwise indicated, the use of Equifax's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of Equifax.

33. Defendant Experian is an entity doing business in the State of Missouri.

34. Defendant Experian's registered agent address is: The Corporation Company, 120 S. Central Ave., Clayton, MO 63105.

35. Defendant Experian regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and use interstate commerce to

prepare and/or furnish the reports.

36. Experian is a "consumer reporting agency" as that term is defined by 15 U.S.C. §1681a(f).

37. Unless otherwise indicated, the use of each Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that respective Defendant.

## IV.    FACTUAL ALLEGATIONS

38. Plaintiff is a family man and a high school principal in Centralia, MO.

39. Plaintiff and his wife share 6 children between them, with 4 of those children still living in their family home.

40. Due to the needs of his family, Plaintiff incurred a lease for a vehicle from Kia of Columbia in or around March 2017 (the "Lease").

41. The vehicle was a 2016 Kia Sedona (the "Vehicle"), and it was used purely for personal and/or household purposes.

42. The Lease was structured as a 36 month lease, with payments owed each month.

43. Plaintiff, and his family, happily used the Vehicle for the duration of the Lease.

44. Plaintiff never missed a monthly payment on the Lease, and was never late on a monthly payment.

45. At the end of the Lease, and not at a date past the maturity date of the Lease, in or around February 2020 Plaintiff took the Vehicle back to Kia of Columbia to return it and get a new vehicle.

46. When the Vehicle was returned at the conclusion of the Lease, Plaintiff had not exceeded the mileage limits allowed under the Lease and the Vehicle did not show any signs of excessive wear or tear.

47. Contemporaneously with the return of the Vehicle, Plaintiff entered into a new lease for a

2020 Kia Sedona minivan (the "Second Lease").

48. The Second Lease was entered into on or about February 29, 2020.

49. Because Plaintiff entered into the Second Lease for the lease of a new Kia vehicle at the termination of the Lease, he received a Loyalty Reward and waiver of Kia's standard disposition fee of $400 associated with a lease turn-in.

50. This Loyalty Reward is only available to customers who are not in default under their lease contract and who act within a specified time period after a vehicle turn-in upon the termination of a lease.

51. Following the termination of the Lease, Plaintiff's wife coordinated with a representative from Kia of Columbia named Brittany, via text message, to retrieve some personal items from the Vehicle that were accidentally left in the Vehicle.

52. These communications occurred on or around March 9, 2020 and March 18, 2020.

53. In these communications, Brittany asked about the Second Lease and asked if Plaintiff's family was enjoying their new vehicle.  Brittany also confirmed that Plaintiff and/or his wife could pick up their personal items from the Vehicle.

54. After picking up their personal items, and on information and belief derived from their transactional history and communications with individuals from Kia of Columbia, Plaintiff believed the Lease to have been successfully terminated and that nothing else was owed.

55. Plaintiff has made all payments on the Second Lease timely pursuant to the terms of the contract.

56. Sometime later, in late spring 2021, Plaintiff and his wife decided to purchase a new home for their large family.

57. With a strong credit history, Plaintiff applied for a mortgage believing himself to be an ideal candidate.

58. Much to his surprise, Plaintiff learned at that time that Kia was in-fact credit reporting to Equifax and Experian that the Lease had been charged-off and that Plaintiff still had an outstanding balance.

59. This was not true, as the Lease had been properly terminated in February 2020 and nothing else was owed on it.

60. Plaintiff never received any communications from Kia stating that more was owed on the Lease and was caught completely off guard.

61. This misreporting severely and negatively impacted Plaintiff's credit-worthiness in the eyes of his mortgage lender and nearly disqualified him for any mortgage at all.

62. However, due to his family's urgent need at that time to acquire housing and close on their home purchase, Plaintiff was forced to take out an ARM with a variable interest rate where he otherwise should have qualified for a standard 30-year fixed rate mortgage at the market rate (approximately 3.164%).

63. His ARM rate was 3.000% for the first twelve months, with the rate changing and/or elevating every twelve months thereafter to a maximum interest rate of 7.000%.

64. Upset, distraught, and without much option, Plaintiff closed on the ARM so that he could secure housing for his family.

65. Thereafter, Plaintiff contacted Kia directly via telephone.

66. In Plaintiff's discussions with Kia, he was told that the Vehicle had been repossessed on or about September 14, 2020.

67. Plaintiff explained that this was incorrect, that the Vehicle had been turned in on February 29, 2020 when he took out the Second Lease, and that his understanding upon turning the Vehicle in to Kia of Columbia was that the Lease had been satisfactorily and successfully terminated.

68. In distress, Plaintiff then contacted Kia of Columbia on or about March 15, 2022, by telephone, to request documents associated with the Lease, the termination of the Lease, and the Second Lease.

69. Kia of Columbia denied having any documents in their custody or control regarding any of these transactions and would not make any further comment.

70. In or around March 22, 2022, Plaintiff received a letter from Kia advising him that he still owed $1,668.03 for the Lease (the "Letter").

71. This balance included $279.03 in accrued taxes, $695.00 for Repossession and Storage Expenses, and $694.00 for Sales, Reconditioning, and Transportation Fees.

72. The Vehicle was not repossessed.

73. The Vehicle was turned-in to a Kia dealership at its conclusion in February 2020 in accordance with Kia's own guidance regarding end-of-lease procedures.

74. Notably, Kia's Letter showed that the $400 turn-in fee had been waived and nothing was owed for that fee.

75. The waiver of the turn-in fee is a tacit acknowledgement that the Lease had been properly terminated and a new lease was entered into with Kia.

76. Plaintiff disputed the reporting of the Lease to Equifax and Experian multiple times, as described below, but Defendants failed to correct his credit reports.

77. In June 2022, with his ARM set to readjust and his payments set to substantially increase beyond what he and his wife could comfortably pay, Plaintiff had to refinance his mortgage.

78. Due to the derogatory and inaccurate information associated with the Lease persisting on his credit reports, Plaintiff was stuck with having to take out a second ARM, as he had no choice if he wished to avoid a significant mortgage rate and payment increase under a

8

conventional mortgage.

79. The refinanced mortgage is a 10-year ARM, which Plaintiff will need to refinance yet again sometime in the future.

80. The starting rate on the refinanced mortgage as 4.125%, and this mortgage can adjust every year starting in year 6. The refinanced mortgage's interest rate could go as high as 9%.

81. The closing costs for the refinanced mortgage, which were financed into the loan balance, totaled approximately $6,364.

82. With interest rates on the rise, Plaintiff's opportunity to secure a favorable rate diminishes as time goes on.

83. The refinanced mortgage was closed on or about June 18, 2022.

84. Kia knew, or should have known, that the Vehicle was turned-in properly and in accordance with its own guidance.

85. Kia knew, or should have known, that the Vehicle was not repossessed.

86. Kia knew, or should have known, that Plaintiff took out the Second Lease at the end of the Lease.

87. Plaintiff disputes that anything further is owed on the Lease.

88. It is illegal and inaccurate for Defendants to report any derogatory collection information about the Lease which was not owed by Plaintiff.

89. Defendants' reporting derogatory information was inaccurate and misleading in that Defendants reporting made it appear as though Plaintiff bore personal liability on the Lease when he did not.

90. Additionally, Defendants' inaccurate reporting did not comply with the Consumer Data Industry Association's Metro 2 reporting standards, which provides guidance for credit reporting and FCRA compliance.

91. The Consumer Data Industry Association ("CDIA") publishes the Metro 2 ("Metro 2") reporting standards to assist furnishers with their compliance requirements under the FCRA.

92. Courts rely on such guidance to determine furnisher liability. *See, e.g., In re Helmes*, 336 B.R. 105, 107 (Bankr. E.D. Va. 2005).

93. On information and belief, Defendants adopted and at all times relevant implemented the Metro 2 format.

94. On information and belief, Defendants adopted the Metro 2 reporting standards and at all times relevant implemented the Metro 2 format as an integral aspect of their respective duties under the FCRA to have in place adequate and reasonable policies and procedures to handle investigations of disputed information.

95. Despite Metro 2 Format's instructions, Defendants failed to conform to the Metro 2 Format when reporting on Plaintiff's accounts as further set forth below.

96. To this end, the adverse reporting on the Plaintiff's report departed from the credit industry's own reporting standards and was not only inaccurate, but also materially misleading under the CDIA's standards as well.

97. A "materially misleading" statement is concerned with omissions to credit entries, that in context create misperceptions about what otherwise may be factually accurate data. *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009).

A. THE IMPACT OF INACCURATE OR MISLEADING INFORMATION ON CONSUMER REPORTS

98. A "Consumer Report", as defined by 15 U.S.C. § 1681a(d)(1), impacts a consumer's eligibility for:

      i.   credit or insurance to be used primarily for personal, family, or household purposes;

ii.   employment purposes; or

iii.   any other purpose authorized under section 1681b.

99.   As a result, the information held within a consumer report impacts not only a consumer's credit worthiness, rating, and capacity, but also the character, general reputation, and personal characteristics of the consumer.

100.   A Federal Trade Commission study mandated by Congress on credit report accuracy ("FTC Study") found that one in five consumers had an error on at least one of their three major credit reports (Equifax, Experian, and Trans Union), with some consumers experiencing inaccuracies that can depress credit scores by over 100 points. *See* https://www.ftc.gov/news-events/press-releases/2013/02/ftc-study-five-percent-consumers-had-errors-their-credit-reports.

101.   The FTC Study found that the types of errors on consumer reports could lead to consumers paying more for products such as auto loans and insurance. *See* https://www.ftc.gov/news-events/press-releases/2013/02/ftc-study-five-percent-consumers-had-errors-their-credit-reports.

**B.   CREDIT SCORING**

102.   The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. *See* https://www.myfico.com/credit-education/credit-scores/.

103.   Defendants' departures from the credit industry's own standards have caused Plaintiff to suffer from reduced FICO credit scores.

104.   The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id.* The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who

makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. *See* http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf.

105. FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; Lease/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. *See* https://www.myfico.com/credit-education/whats-in-your-credit-score/.

106. Leases/amounts owed is one of the most important aspects of a consumer's credit score because it shows how the consumer has managed their finances, including what liabilities the consumer still has. Credit history is also very important, as it demonstrates how long the consumer has been managing their accounts, when their last payments were made, and any recent charges. *See* https://www.Equifax.com/credit-score.

107. The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

108. Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

109. Incorrectly reporting the KIA tradeline as a collection account with a balance owed of

$1,407 adversely affects Plaintiff's FICO scores, as it makes it appear that Plaintiff has liabilities that Plaintiff does not in fact have, and that Plaintiff does not satisfy his obligations when in fact he does.

110. There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. For example, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

111. Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. *See* https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/.

## C. PLAINTIFF'S CREDIT REPORTING DISPUTES

112. In or around early March 2022, Plaintiff sent dispute letters to Equifax and Experian to dispute their reporting of the Lease pursuant to 15 U.S.C. § 1681i by notifying Equifax and Experian, in writing, of the inaccurate and derogatory information reporting on the tradeline associated with the Lease.

113. Plaintiff sent a letter to Equifax requesting the above inaccurate and incorrect derogatory information be updated, modified, or corrected as to the Lease.

114. Plaintiff sent a letter to Experian requesting the above inaccurate and incorrect derogatory information be updated, modified, or corrected as to the Lease.

115. Equifax was required to conduct a reinvestigation into the Lease on Plaintiff's consumer report pursuant to 15 U.S.C. § 1681i.

116. Experian was required to conduct a reinvestigation into the Lease on Plaintiff's consumer report pursuant to 15 U.S.C. § 1681i.

117. Equifax was required to send notice of Plaintiff's dispute to Kia, pursuant to 15 U.S.C. § 1681i(a)(2).

118. Experian was required to send notice of Plaintiff's dispute to Kia, pursuant to 15 U.S.C. § 1681i(a)(2).

119. Upon information and belief, Equifax notified Kia of Plaintiff's dispute.

120. Upon information and belief, Experian notified Kia of Plaintiff's dispute.

121. Upon information and belief, Kia received notice of Plaintiff's dispute as to the reporting of the Lease on Plaintiff's Equifax Credit Report.

122. Upon information and belief, Kia received notice of Plaintiff's dispute as to the reporting of the Lease on Plaintiff's Experian Credit Report.

123. A reasonable investigation by Equifax and Kia would have indicated that they were reporting the Lease inaccurately on Plaintiff's Equifax Credit Report.

124. A reasonable investigation by Experian and Kia would have indicated that they were reporting the Lease inaccurately on Plaintiff's Experian Credit Report.

125. Instead, Kia re-reported the Lease inaccurately to Experian and Equifax.

126. Equifax re-reported the Lease inaccurately as well.

127. Experian also re-reported the Lease inaccurately.

**D. THE CONTINUED INACCURATE REPORTING OF THE LEASE ON PLAINTIFF'S EQUIFAX CREDIT REPORT**

128. On dispute results from Equifax dated April 5, 2022 ("Equifax Dispute Results"), Equifax and Kia re-reported inaccurate information about the Lease.

129. Specifically, on the Equifax Dispute Results, Equifax and Kia were reporting the Account Status as "CHARGE_OFF", the Reported Balance was "$1,668", an Amount Past Due of "$1,668", a Charge Off Amount of "$14,463", a date of first delinquency of "2/2020", and

the Comments section state "Charged off account".

130. Equifax and Kia's reporting on the Equifax Dispute Results was inaccurate because the result of their reporting was to make it appear as if Plaintiff bore personal liability and a present obligation to pay the Lease when Plaintiff did not owe anything further to the Lease.

131. On a follow-up Equifax credit report accessed by Plaintiff and dated April 28, 2022 ("Equifax 4/28/22 Report"), Equifax failed to remove or correct the inaccurately reported information regarding the Lease from the Equifax 5/28/22 Report.

132. Instead, on the Equifax 4/28/22 Report, Equifax and Kia continued to inaccurately report the Lease.

133. Specifically, Equifax and Kia were reporting on the Equifax 4/28/22 Report the Account Status as "CHARGE_OFF", the Reported Balance was "$1,668", the Lease was reported as "CO" (charge off) every month from August 2020 on, an Amount Past Due of "$1,668", and the Comments section state "Charged off account".

134. Equifax and Kia's reporting on the Equifax 4/28/22 Report was inaccurate because the result of their reporting was to make it appear as if Plaintiff bore personal liability and a present obligation to pay the Lease when Plaintiff did not owe anything further to the Lease.

135. These reportings caused Plaintiff confusion regarding the status of the Lease, his obligation to pay or not-pay the Lease, and stress and anxiety that he could be the subject of collections efforts for an obligation that had been timely and properly satisfied.

E. **THE CONTINUED INACCURATE REPORTING OF THE LEASE ON PLAINTIFF'S EXPERIAN CREDIT REPORT**

136. On a follow-up Experian credit report accessed by Plaintiff and dated April 28, 2022 ("Experian 4/28/22 Report"), Experian failed to remove or correct the inaccurately reported information regarding the Lease from the Experian 4/28/22 Report.

137. Instead, on the Experian 4/28/22 Report, Experian and Kia continued to inaccurately report the Lease.

138. Specifically, on the Experian 4/28/22 Report, Experian and Kia were reporting the Status as "Account charged off/Never late. $14,463 written off. $1,668 past due as of Apr 2022," the Balance was "$1,668", and the Payment History showed "CO" (charge off) every month from August 2020 on.

139. Experian and Kia's reporting on the Experian 4/28/22 Report was inaccurate because the result of their reporting was to make it appear as if Plaintiff bore personal liability and a present obligation to pay the Lease when Plaintiff did not owe anything further to the Lease.

140. The Experian 4/28/22 Report caused Plaintiff confusion regarding the status of the Lease, his obligation to pay or not-pay the Lease, and stress and anxiety that he could be the subject of collections efforts for an obligation that had been timely and properly satisfied.

**F. PLAINTIFF'S SECOND CREDIT REPORTING DISPUTES**

141. On or about May 4, 2022, Plaintiff sent dispute letters to Equifax and Experian to again dispute their reporting of the Lease pursuant to 15 U.S.C. § 1681i by notifying Equifax and Experian, in writing, of the incorrect and inaccurate information.

142. Plaintiff sent a letter to Equifax requesting the above inaccurate and incorrect derogatory information be updated, modified, or corrected as to the Lease.

143. Plaintiff sent a letter to Experian requesting the above inaccurate and incorrect derogatory information be updated, modified, or corrected as to the Lease.

144. Equifax was required to conduct a reinvestigation into the Lease on Plaintiff's consumer report pursuant to 15 U.S.C. § 1681i.

145. Experian was required to conduct a reinvestigation into the Lease on Plaintiff's consumer report pursuant to 15 U.S.C. § 1681i.

146. Equifax was required to send notice of Plaintiff's dispute to Kia, pursuant to 15 U.S.C. § 1681i(a)(2).

147. Experian was required to send notice of Plaintiff's dispute to Kia, pursuant to 15 U.S.C. § 1681i(a)(2).

148. Upon information and belief, Equifax notified Kia of Plaintiff's dispute.

149. Upon information and belief, Experian notified Kia of Plaintiff's dispute.

150. Upon information and belief, Kia received notice of Plaintiff's dispute as to the reporting of the Lease on Plaintiff's Equifax Credit Report.

151. Upon information and belief, Kia received notice of Plaintiff's dispute as to the reporting of the Lease on Plaintiff's Experian Credit Report.

152. A reasonable investigation by Equifax and Kia would have indicated that they were reporting the Lease inaccurately on Plaintiff's Equifax Credit Report.

153. A reasonable investigation by Experian and Kia would have indicated that they were reporting the Lease inaccurately on Plaintiff's Experian Credit Report.

154. Instead, Kia re-reported the Lease inaccurately to Experian and Equifax.

155. Equifax re-reported the Lease inaccurately as well.

156. Experian also re-reported the Lease inaccurately.

**G. THE CONTINUED INACCURATE REPORTING OF THE LEASE ON PLAINTIFF'S EQUIFAX CREDIT REPORT FOLLOWING THE SECOND DISPUTE**

157. On a follow-up Equifax credit report accessed by Plaintiff and dated June 14, 2022 ("Equifax 6/14/22 Report"), Equifax failed to remove or correct the inaccurately reported information regarding the Lease from the Equifax 6/14/22 Report.

158. Instead, on the Equifax 6/14/22 Report, Equifax and Kia continued to inaccurately report the Lease.

159. Specifically, Equifax and Kia continued to report the Account Status as "CHARGE_OFF", the Reported Balance changed to "$1,407", the historical data had been updated to eliminate the "CO" (charge off") notation but had curiously been replaced with remarks showing payments were on time through April 2022, an Amount Past Due of "$1,407", and the Comments section continued to state "Charged off account".

160. Equifax and Kia's reporting on the Equifax 6/14/22 Report was inaccurate because the result of their reporting was to make it appear as if Plaintiff still bore personal liability and a present obligation to pay the Lease when Plaintiff did not owe anything further to the Lease.

161. The Equifax 6/14/22 Report caused Plaintiff confusion regarding the status of the Lease, his obligation to pay or not-pay the Lease, and stress and anxiety that he could be the subject of collections efforts for an obligation that had been timely and properly satisfied.

162. The inaccurate information on the Equifax 6/4/22 Report was still present when Plaintiff had to refinance his mortgage loan on June 18, 2022, hurting his credit-worthiness in the eyes of his mortgage lender and leaving him with a severely less desirable interest rate.

## H. THE CONTINUED INACCURATE REPORTING OF THE LEASE ON PLAINTIFF'S EXPERIAN CREDIT REPORT FOLLOWING THE SECOND DISPUTE

163. On a follow-up Experian credit report accessed by Plaintiff and dated June 14, 2022 ("Experian 6/14/22 Report"), Experian failed to remove or correct the inaccurately reported information regarding the Lease from the Experian 6/14/22 Report.

164. Instead, on the Experian 6/14/22 Report, Experian and Kia continued to inaccurately report the Lease.

165. Specifically, Experian and Kia were reporting the Status as "Account charged off/Never late. $1,407 written off. $1,407 past due as of May 2022," the Balance was "$1,407", and

the Payment History had curiously been updated with remarks showing payments were on time through April 2022 and that the Lease had been charged off in May 2022.

166. Experian and Kia's reporting on the Experian 6/14/22 Report was inaccurate because the result of their reporting was to make it appear as if Plaintiff bore personal liability and a present obligation to pay the Lease when Plaintiff did not owe anything further to the Lease.

167. The Experian 6/14/22 Report caused Plaintiff confusion regarding the status of the Lease, his obligation to pay or not-pay the Lease, and stress and anxiety that he could be the subject of collections efforts for an obligation that had been timely and properly satisfied.

168. The inaccurate information on the Experian 6/4/22 Report was still present when Plaintiff had to refinance his mortgage loan on June 18, 2022, hurting his credit-worthiness in the eyes of his mortgage lender and leaving him with a severely less desirable interest rate.

## I. DEFENDANTS' EQUIFAX, EXPERIAN, AND KIA'S VIOLATIONS OF THE FCRA AND PLAINTIFF'S ASSOCIATED DAMAGES

169. It is inaccurate to report that a balance is owed on an account when it is not.

170. It is inaccurate to report an account as past due when it is not.

171. It is inaccurate to report a liability which is not in fact owed.

172. It is inaccurate to report that an account was charged off when it was not.

173. As evidenced by Equifax's re-reporting of the Lease after Equifax's failure to correct the reporting of the Lease on Plaintiff's credit reports, despite being advised multiple times that the reported information was inaccurate, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates as required by and in violation of 15 U.S.C. § 1681e(b).

174. As evidenced by Experian's re-reporting of the Lease after Experian's failure to correct the

reporting of the Lease on Plaintiff's credit reports, despite being advised multiple that the reported information was inaccurate, Experian failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates as required by and in violation of 15 U.S.C. § 1681e(b).

175. As evidenced by the inaccurate re-reporting after Plaintiff sent Defendants detailed disputes identifying the inaccurate information related to the Lease, Defendants, upon receipts of Plaintiff's disputes, each failed to conduct an investigation or reinvestigation with respect to the disputed information as required by 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b).

176. Defendants failed to review all relevant information provided by Plaintiff in the disputes to Defendants, as required by and in violation of 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b).

177. Due to Defendants' failure to reasonably investigate, Defendants further failed to correct and update Plaintiff's information as required by 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b), thereby causing continued reporting of inaccurate information in violation of 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b).

178. Defendants' continued inaccurate and negative reporting of the Lease in light of their knowledge of the actual error was willful. Plaintiff is, accordingly, eligible for statutory damages under the FCRA.

179. Reckless disregard of a requirement of the FCRA qualifies as a willful violation of the FCRA within the meaning of section 1681n(a). *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 71 (2007).

180. Based upon Defendants' knowledge that Plaintiff owed nothing on the Lease and that their reporting was inaccurate, even if Defendants could claim they did not willfully violate the

FCRA, their conduct was at the very least done with reckless disregard of their obligations under 15 U.S.C. § 1681e(b), and/or 15 U.S.C. § 1681i, and/or 15 U.S.C. § 1681s-2(b).

181. Also as a result of Defendants' continued inaccurate and negative reporting, Plaintiff has suffered actual damages, including, without limitation, fear of credit denials, out-of-pocket expenses in challenging Defendants' inaccurate reporting, damage to Plaintiff's creditworthiness, damage to Plaintiff's credit reputation, and emotional distress.

182. By inaccurately reporting account information, Defendants acts and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit score and other credit rating model scores.

183. The adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than she otherwise would.

184. Creating the false impression of Plaintiff having past due obligations to Kia creates a material risk that Plaintiff would be denied credit, receive less favorable credit treatment than Plaintiff otherwise would, or receive other unfavorable treatment than Plaintiff otherwise would, from any viewer of Plaintiff's credit report that is engaged in judgment-based lending.

185. Because of the false reporting as discussed herein, Plaintiff was denied credit and/or did receive less favorable credit treatment than Plaintiff otherwise should have, and/or caused Plaintiff to receive other unfavorable treatment that Plaintiff otherwise would not have received, from viewers of Plaintiff's credit report that are/were engaged in judgment-based lending.

186. Plaintiff's Experian and Equifax credit reports were published to third parties while the inaccurate and/or materially misleading information discussed in this Complaint was present on its report.

187. Defendants thus caused a defamation-type harm upon Plaintiff, resulting in significant actual damages.

188. By inaccurately reporting account information after notice and confirmation of its errors, Defendants failed to take the appropriate measures as required under 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**
**The Fair Credit Reporting Act**
**15 U.S.C. § 1681 *et seq*. (FCRA)**

189. Plaintiff repeats, re-alleges, and incorporates by reference all above paragraphs.

190. The foregoing acts and omissions constitute numerous and multiple violations of the FCRA.

191. Defendants' violations of the FCRA as alleged above, include, but are not limited to 15 U.S.C. §§ 1681e(b), 1681i, and/or 1681s-2(b).

192. As a result of each negligent violation of the FCRA, Plaintiff is entitled to actual damages from Defendants, pursuant to 15 U.S.C. § 1681o(a)(1); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681o(a)(2).

193. As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages or statutory damages of not less than $100.00 and not more than $1,000.00, pursuant to 15 U.S.C. §1681n(a)(1)(A); punitive damages as the court may allow, pursuant to 15 U.S.C. §1681n(a)(2); and reasonable attorney's fees and costs pursuant to 15 U.S.C. §1681n(a)(3) from Defendants.

**Request for Jury Trial**

194. Plaintiff is entitled to, and demands, a trial by jury.

**Prayer For Relief**

Wherefore, Plaintiff respectfully requests the Court grant Plaintiff the following relief against Defendants:

1.      A declaratory judgment that Defendants' actions violated the FCRA;

2.      Plaintiff's actual damages from Defendants for harms resulting from the FCRA;

3.      Statutory damages of not less than $100.00 and not more than $1,000.00 to Plaintiff, pursuant to 15 U.S.C. § 1681n(a)(1), from each Defendant;

4.      Punitive damages against each Defendant, pursuant to 15 U.S.C. §1681n(a)(2);

5.      An award of costs of litigation and reasonable attorney's fees from each Defendant, pursuant to 15 U.S.C. § 1681o(a)(2) and/or 15 U.S.C. § 1681n(a)(3); and

6.      Any other relief the Court may deem just and proper.

Dated: __06/29/2022_____                    Respectfully submitted,

                                                                    /s/ James R. Crump_____
                                                                    James R. Crump #65514
                                                                    Ryan M. Callahan #62666
                                                                    **Callahan Law Firm, LLC**
                                                                    222 W. Gregory Blvd., Suite 210
                                                                    Kansas City, MO 64114-1138
                                                                    Ph: 816-822-4041
                                                                    james@callahanlawkc.com
                                                                    ryan@callahanlawkc.com
                                                                    Attorneys for Plaintiff